**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| NORTH SHORE MEDICAL CENTER, INC., *et al.*, | : <br> : <br> : <br> : |
| | :    Case No. 1:20-cv-24914-KMM |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | : <br> : <br> : |
| Defendant. | : |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

LEGAL STANDARD.................................................................................................................4

FACTUAL BACKGROUND AND ARGUMENT.........................................................................5

I.      Summary Judgment Is Proper Because the Hospitals Failed to Show that Cigna
        Underpaid Their Claims in Violation of Florida Statute § 627.64194 ............................5

        A.      The Hospitals' 75%-of-Billed-Charges FMV Ignores Multiple Data Points
                that Baker County Says Must Be Considered, Including In-Network Paid
                Amounts.................................................................................................................5

        B.      Billed Charges Are Not Real Prices, and They Cannot Form the Basis of
                FMV......................................................................................................................11

        C.      The Eight Plaintiffs-Hospitals Are Not the Relevant "Community," as the
                Florida Requires...................................................................................................15

II.     For the 36 Remaining Disputed Inpatient Claims, the Hospitals Do Not Have
        Admissible Evidence to Show When the Patients' EMC Ended......................................16

III.    The Court Should Dismiss Without Prejudice All Individual Claim Lines from the
        Disputed Claims that Cigna Fully Denied for Reasons Unrelated to this Dispute ...........17

IV.     The Court Should Enter Summary Judgment on Five Claims Under Non-Florida
        Insurance Policies ..........................................................................................................20

CONCLUSION..........................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................. 5

*Baker Cty. Med. Servs., Inc. v. Aetna Health Mgmt., LLC*,
31 So. 3d 842 (Fla. 1st DCA 2010) ...................................................... *passim*

*Bowden v. Med. Ctr., Inc.*,
309 Ga. 188 (2020) ........................................................................................... 12

*Colomar v. Mercy Hosp., Inc.*,
461 F. Supp. 2d 1265 (S.D. Fla. 2006) ...................................................... 12

*Hamilton Grp. Funding, Inc. v. Basel*,
311 F. Supp. 3d 1307 (S.D. Fla. 2018) ...................................................... 5

*Miccosukee Tribe of Indians of Fla. v. U.S.*,
516 F.3d 1235 (11th Cir. 2008) ................................................................... 5

*In re N. Cypress Med. Ctr. Operating Co., Ltd.*,
559 S.W.3d 128 (Tex. 2018) ......................................................................... 12

*N. Shore Med. Ctr., Inc. v. Cigna Health & Life Ins. Co.*,
2021 WL 3419356 (S.D. Fla. May 10, 2021) .......................................... 9

*Ray v. Equifax Info. Servs.*,
LLC, 327 F. App'x 819 (11th Cir. 2009) ................................................ 5

*U.S. v. Berkeley Heartlab, Inc.*,
2017 WL 2972143 (D.S.C. July 12, 2017) ............................................... 12

*Worldwide Aircraft Servs., Inc. v. United Healthcare Ins. Co.*,
2018 WL 6589838 (M.D. Fla. Dec. 14, 2018) ...................................... 20

**Statutes**

Florida Statute § 627.64194 ........................................................... *passim*

Florida Statute § 641.513 ................................................................. *passim*

**Other Authorities**

Fed. R. Civ. P. 56(a) .......................................................................... 4

## <u>PRELIMINARY STATEMENT</u>[1]

Pursuant to Federal Rule of Civil Procedure 56, Cigna Health and Life Insurance Company ("Cigna") moves for summary judgment or, in the alternative, for partial summary judgment, on three grounds.

<u>First</u>, the Hospitals have failed to show that Cigna actually paid less for their emergency service claims than what is required under Florida Statute § 627.64194, their only claim. This statute is patient-protective; its obvious intent is to make sure that a patient with an emergency condition is not penalized if the ambulance happens to take him or her to an out-of-network hospital rather than an in-network one. Florida courts interpret this statute to require payors like Cigna to pay for out-of-network emergency services at fair market value ("FMV"). And Florida courts have clarified that calculating FMV for a particular emergency service requires analyzing how much a hospital typically gets paid for that service in arm's-length transactions in the market—including, in particular, based on the hospital's "contracts with insurers." *Baker Cty. Med. Servs., Inc. v. Aetna Health Mgmt., LLC*, 31 So. 3d 842, 844-45 (Fla. 1st DCA 2010). Other payment sources must be considered as well to get a true representation of market value. These include "contracts with other health maintenance organizations, worker's compensation payments, private pay, charity care, indigent care, and payments received from ***any other payer source*** [other than Medicare and Medicaid]." *Id.* Finally, the benchmark at issue here is based on "usual and customary provider charges for similar ***services*** in the community," Fla. Stat. § 641.513(5)(b), which makes it clear that this is a clinical inquiry (*i.e.*, how much do other providers in the

---

[1] Unless otherwise noted, all emphasis has been added, and all citations, alterations, and internal quotation marks have been omitted. A Statement of Material Facts ("SMF") is filed herewith.

community charge for a similar surgical procedure?), rather than an inquiry based on whether the service is in-network or out-of-network.

The Hospitals know that this is how FMV is supposed to be calculated under the statute. They previously acknowledged that calculating FMV requires analyzing "the amounts Cigna has actually paid to comparable medical providers and the amounts Plaintiffs' have actually accepted from payers on comparable claims." (SMF ¶ 1.) They also asked for—and Cigna produced—data showing how much Cigna pays for both in-network and out-of-network emergency services, just like *Baker County* contemplates. And the Hospitals also produced their own data to show how much other payors paid them for both in-network and out-of-network emergency services.

The problem, though, is that this paid claims data apparently did not yield the damages number that the Hospitals wanted—so the Hospitals have now come up with an entirely different definition of what FMV means. They now say that FMV for all of their emergency services is a flat 75% of the Hospitals' billed charges, for every single claim, for every single one of the eight different Hospitals at issue—most of which have different billed charge amounts.

This FMV theory is contrary to Florida law. As noted above, *Baker County* says that FMV should factor in the hospital's actual payment sources, including its in-network and out-of-network contracts. The Hospitals indisputably did not do this analysis. Their valuation expert admitted that this 75% of billed charges FMV is based on a tiny subset of their overall payments— accounting for ***less than 1%*** of the Hospitals' actual paid emergency claims, and excluding all of the Hospitals' in-network payments and out-of-network contracted payments with other payors.

Obviously, any real measure of FMV cannot be based on less than 1% of a hospitals' actual paid claims data. The Hospitals try to justify this tiny sample size by arguing that it comprises the only "comparable" claims to the claims in dispute. And the only sources that the Hospitals' expert

says are comparable were those that he felt offered the same benefit proposition to the Hospitals as the out-of-network emergency services at issue here.  This "comparability" analysis has no place under Florida Statute § 627.64194.  Again, the statute is supposed to protect patients with an emergency from being penalized for going to an out-of-network provider, so that the patient can focus on getting the emergency treated rather than worry about the hospital's contracted status.  It would make no sense if this statute considered only out-of-network payment sources to determine the statutory rate (also used to calculate the patient's responsibility).  That is why when explaining what payment sources to include in FMV, *Baker County* made clear that the key question is what "price . . . a willing buyer will pay and a willing seller will accept in an arm's-length transaction"—including the hospital's in-network "contracts with insurers."  *Id.* at 845.

The Hospitals repeatedly acknowledged that they need expert testimony to prove up their definition of FMV.  But their expert's exclusion of ████ of their claims—including ████████ ████████—from his FMV calculation is wrong as a matter of law.  Those FMV opinions fail Rule 702, for reasons detailed in the accompanying Motion to Exclude; but even if admitted, those opinions do not show that Cigna paid the disputed claims at less than "the usual and customary provider charges for similar services in the community where the services were provided," as Florida Statute § 641.513(5) requires, and the Hospitals cannot make out their claim.

Second, the Court should grant summary judgment on 36 inpatient claims still in dispute because the Hospitals have not carried their burden to show that those patients had ongoing emergency medical conditions ("EMC") that trigger Cigna's payment obligations under Florida Statute § 641.513(5).  Cigna submitted expert evidence from medical doctors to identify the dates on which each of these patients stabilized, such that their EMC came to an end.  The Hospitals then served a report from Dr. Ramirez, purportedly in rebuttal.  As detailed in the Motion to

Exclude, those opinions should be excluded because they are improper rebuttal opinions, including because Dr. Ramirez did not actually opine on dates on which these patients' EMC ended or the standard for making that determination.  And while Dr. Ramirez came up with new opinions ███ ████████████████████████████████████████████████, those opinions should be excluded as untimely and improper under Rule 26(a)(2)(B).  Without expert evidence on this point, the Hospitals cannot carry their burden to show that these patients had ongoing EMCs to trigger Cigna's payment obligations under Florida Statute § 627.64194.

Third, at a minimum, the Court should dismiss the denied charges in 219 claims that Cigna partially denied in the normal course of business, as summarized in Exhibit 15 to the SMF. (SMF ¶ 42).  This Court has recognized that there is a difference between a "right to payment" versus a "rate of payment" dispute—because "nonpayment, or zero payment, infers that the claim has been outright denied"—and it dismissed "claims for which Cigna fully denied coverage."  (SMF ¶ 2.)  After this ruling, the Hospitals agreed to "remove . . . 47 claims that they have identified as *partially* denied" (*id.* ¶ 3)—that is, claims where Cigna denied a particular individual claim service line but not the entire claim.  As Cigna previously said, there are additional partially-denied claims that likewise should have been removed from the case but that the Hospitals failed to dismiss. (SMF ¶ 4.)  Those denied claim lines should now be dismissed.

Finally, the Court should grant summary judgment for Cigna on five claims described below, because they involve patients covered by insurance policies that were issued outside the State of Florida, and are thus outside the scope of Florida Statute § 627.64194(4).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. U.S.*, 516 F.3d 1235, 1243 (11th Cir. 2008).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, "the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts," and it "must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Ray v. Equifax Info. Servs.*, LLC, 327 F. App'x 819, 825 (11th Cir. 2009). "The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing of an essential element of the case to which the non-moving party has the burden of proof." *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1312 (S.D. Fla. 2018).

## FACTUAL BACKGROUND AND ARGUMENT

I.    **Summary Judgment Is Proper Because the Hospitals Failed to Show that Cigna Underpaid Their Claims in Violation of Florida Statute § 627.64194.**

    A.    **The Hospitals' 75%-of-Billed-Charges FMV Ignores Multiple Data Points that *Baker County* Says Must Be Considered, Including In-Network Paid Amounts.**

Plaintiffs are eight hospitals in south Florida affiliated with Tenet Healthcare Corporation (together, "Hospitals"). (SMF ¶ 5.) The Hospitals are out-of-network with Cigna for insurance policies issued in Florida through the Affordable Care Act exchange (the "Exchange Act plans"). (*Id.* ¶ 6.) Cigna's Exchange Act plans do not provide out-of-network benefits, which means that members of those plans generally will not have coverage for the Hospitals' services. (*Id.* ¶ 7.)

Florida Statutes §§ 627.64194 and 641.513(5) provide a statutory overlay for paying claims for emergency services, however. Florida Statute § 641.513(5) says that such claims are to be paid at the lesser of three benchmarks (two of which are not at issue here), including at "the usual and customary provider charges for similar service[] in the community where the services were

provided."  Most health plans, including Exchange Act plans, require covered individuals to pay some amount of the cost of the services they receive from a hospital, typically through paying a deductible or co-insurance amount (% of the cost).  (*Id.* ¶ 8.))  Thus, the point of this statute is both to make sure that providers are fairly compensated (by being paid FMV) for providing emergency services, but also to ensure that a person who likely had no choice but to go to an out-of-network hospital for an emergency is not exposed to above-market charges for the services they needed.

That is why Florida Statute § 627.64194(5) says that an out-of-network provider of emergency services "may ***not*** be reimbursed an amount greater than the amount provided in subsection (4)" (*i.e.*, an amount no greater than the "lesser of" the three benchmarks in Florida Statue § 641.513(5), which subsection (4) references).  And that is also why Florida Statute § 627.64194(5) also says that an out-of-network emergency provider "may not collect or attempt to collect from the insured . . . any excess amount, other than copayments, coinsurance, and deductibles"—*i.e.*, it prohibits the provider from collecting from the member the difference between the member's out-of-pocket cost-share and the provider's total billed charges, a practice known as balance-billing.  In short, rather than let out-of-network emergency providers charge whatever they want and expect to be paid based on their charges, these statutes impose a "usual and customary" ceiling on payment for emergency services, both on the member's cost-share and on the amounts due from the payor.

To that end, Florida courts have interpreted Florida Statute § 627.64194 to require paying for emergency services at "fair market value."  *See Baker Cty.*, 31 So. 3d at 844-45.  There is no question that calculating FMV under this statute must account for the amounts that the hospital receives for in-network emergency services.  *Baker County* makes this clear, since that was also a case involving out-of-network emergency services, and the appellate court affirmed the trial

court's holding that the FMV for those claims should include considering the hospital's "***contracts with insurers***"—that is, in-network payor contracts—in addition to the hospital's "contracts with other health maintenance organizations, worker's compensation payments, private pay, charity care, indigent care, and payments received from any other payer source [other than Medicare and Medicaid]." *Id.* at 845. If a hospital's in-network rates should be excluded in calculating FMV under this statute, *Baker County* would have said so. Instead, it affirmed the trial court's opinion "with one exception" for Medicare and Medicaid, finding that those government-set schedules did not reflect "an arm's-length transaction." *Id.*

Taking into account how much a hospital gets paid for in-network emergency services makes perfect sense. After all, the amounts that hospitals receive under contracts account for the vast majority of their managed care revenue—and the Hospitals here are no exception. As Clint Hailey, head of Managed Care of the Hospitals' parent company (Tenet Healthcare Corporation), agreed at his deposition, ███████████████████████████████████████████████ ████████████████████████████████████████████ (SMF ¶ 9.) Mr. Hailey also agreed that those bargained-for contracted rates ████████████████████████████ ████████████████████████████████ (SMF ¶ 10.) And it also makes perfect sense to take into account how much the Hospitals receive when they have contracted out-of-network rates with payors other than Cigna, like Blue Cross Blue Shield Florida, for example— given that one of the Hospitals' Rule 30(b)(6) representatives admitted that it is a "competitor of Cigna," and, ████████████████████████████████████████████ ██████████████████████████████████████████ (*Id.* ¶ 11; *id.* ¶ 12.)

The Hospitals themselves clearly know that all of these rates with other payors should be part of a proper FMV analysis. That is why during discovery, they asked Cigna to produce data to

show how much Cigna pays its in-network providers for emergency claims.  (SMF ¶ 13 (the Hospitals' interrogatory asking Cigna to "identify the rates set forth in all agreements between You and any Participating Providers in Florida relating to the provision of [ER] services or [non-ER] services to Plan Members").)  Cigna agreed to produce that information.  (*See id.*)  The Hospitals also produced data showing how much they receive for emergency claims from Cigna and also from other payors, both on an in-network and out-of-network basis.  (*Id.* ¶ 14).

So given these discovery requests, and given the Hospitals' prior promises that their expert's FMV analysis would actually take into account "the amounts Cigna has actually paid to comparable medical providers" (*id.* ¶ 1), Cigna expected that the Hospitals' FMV analysis would comply with *Baker County* and factor in their in-network payments, as well as out-of-network payments they receive from other payors.

That is not what happened.  Instead, the Hospitals hired a valuation expert (Jim Watson), who cherry-picked a handful of the hospitals' payment sources—notably, ***excluding*** all in-network contracts, as well as all of the Hospitals' contracted rates for out-of-network services with other payors—and came up with 75% of billed charges as the FMV for every single disputed claim for every single Hospital.  (SMF ¶ 15.)

This number did not come out of the blue.  In their original Complaint, the Hospitals asserted a number of common-law claims in addition to their claim under Florida Statute § 627.64194.  (*Id.* ¶ 16.)  To support those claims, the Hospitals argued that there was a "course of dealing" that obligates Cigna to pay their out-of-network emergency services "at 75% of the Hospitals' billed charges"—primarily because Cigna previously did so under a contract that it terminated effective January 1, 2019, two years before any of the disputed claims.  (*Id.* ¶ 17.)

The Court correctly rejected this theory.  In dismissing the promissory estoppel claim with prejudice, it found that "Plaintiffs' reliance on the course of dealing under the terms of an expired contract" was "unpersuasive," because "if the Court were to find that the terms of the expired contract—specifically that Cigna would pay the Hospitals 75% of the Hospitals' billed charges for out-of-network services—formed a basis for Plaintiffs' promissory estoppel claim, then presumably any term of the expired contract could continue to apply and Plaintiffs could be entitled to any agreements made therein, receiving the full benefit of the bargain of the expired contract to Cigna's detriment." *N. Shore Med. Ctr., Inc. v. Cigna Health & Life Ins. Co.*, 2021 WL 3419356, at *1, *6 (S.D. Fla. May 10, 2021).

The Hospitals did not get the message.  Rather than come up with an FMV that actually represents the market and takes into account both in-network and out-of-network payments, like *Baker County* says they should, the Hospitals found an expert who they thought would get them back to the same 75%-of-billed-charges value they wanted all along.  To do so, that expert, Mr. Watson, █████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (SMF ¶ 15.)

As detailed in the Motion to Exclude, Mr. Watson's FMV "analysis" is not based on any reliable methodology; it is window-dressing, purposefully designed to back into the 75% number at which the Hospitals want to be paid.  Mr. Watson's FMV opinions are unreliable *ipse dixit* and they should be excluded under Rule 702 accordingly.  But even if admitted, those FMV opinions do not create a genuine issue of material fact.  That is because the Hospitals' FMV definition is contrary to the statute's definition of FMV as interpreted by Florida courts—most significantly

because the Hospitals' definition excludes ████████████████████████████████

███████, and because it also excludes numerous other payment sources ██████████████

████████████████████████████ that *Baker County* says must be considered.

To be clear, the ***only*** way that Mr. Watson was able to get to this 75%-of-billed-charges

number is by ██████████████████████. As explained in the Motion to Exclude, applying the

██████████████████████████████████████ would have resulted in FMV well below 75%

of the Hospitals' billed charges—██████████████████████ (Mot. to Exclude at 9.) Mr. Watson

also excluded ████████████████████████████████████████████████████

██████████████████████████—which is inexplicable, since the Hospitals admitted

that those contracts in fact are relevant.  (SMF ¶ 18 (stating in an interrogatory response that the

rates "most comparable" to rates for the disputed Cigna claims are "the rates provided by leased

networks, single case agreements and ***contracted out-of-network agreements*** (including, for

example ***and without limitation***, the historical out-of-network rate between Cigna and Plaintiffs)";

SMF ¶ 19 (████████████████████████████████████████████████).)

Particularly given that the Hospitals get ██████████████████████████████████

██████████████████, the fact that Mr. Watson ignored all this data means that his analysis fails

to answer the question under *Baker County* of what "price . . . a willing buyer will pay and a

willing seller will accept in an arm's-length transaction" for an emergency service claim.  31 So.3d

at 845.  The Hospitals previously made it clear that they will rely on Mr. Watson's analysis to

establish the FMV of their claims—representing that "the analysis to determine fair market value

is the province of expert discovery and testimony."  (SMF ¶ 20; *see also id.* ¶ 18 (the Hospitals

stating in an interrogatory response that they "retained an expert . . . to determine the [FMV] of

the services Plaintiffs provided to Cigna's members.").)  But Mr. Watson's FMV opinions do not satisfy *Baker County*, and the Hospitals have failed to carry their burden on this critical element.

The only explanation the Hospitals presented for their improper elimination of 99% of the paid claims is that those claims are supposedly ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████  The Section 641.513(5)(b) benchmark at issue here is the amount of "the usual and customary provider charges ***for similar services*** in the community where the services were provided"—which, given that it centers on "services," is plainly a clinical inquiry (*i.e.*, how much do other providers charge for a surgery similar to this one?), rather than an inquiry based on the provider's contracted status.

If FMV under Florida Statute § 641.513 only meant to take into account ████████████ ████████████████████████████████████████████████, then the Florida legislature could have written that directly into the statute.  It did not, and it is obvious that FMV under this statute is intended to take into account far more than just ████████████████████.  *Baker County* said as much, in fact, when it affirmed—in a case involving an out-of-network hospital like Plaintiffs here—that FMV should be based on many other sources, including most strikingly the hospital's "contracts with insurers."  31 So.3d at 845.  The Hospitals' exclusion of over ████ of their paid claims from their FMV analysis—and particularly their exclusion of all of their ████████ ████████████████████████████████████████████████—means that their FMV calculation is wrong as a matter of law.  The Hospitals should not be allowed to present this flawed and facially invalid FMV calculation to the jury, because a jury verdict based on an FMV opinion that is flatly inconsistent with the Florida statute could not stand.

**B.**    **Billed Charges Are Not Real Prices, and They Cannot Form the Basis of FMV.**

The Hospitals' argument that the FMV for their emergency claims is 75% of billed charges

also cannot be squared with *Baker County* for another reason.  As *Baker County* recognized, the "fair market value of the services provided" is "the price that a willing buyer will pay and a willing seller will accept in an arm's-length transaction."  31 So. 3d at 845.  And this emphasis on how much the hospital is actually able to ***obtain*** in payment on a particular claim rather than on how much the hospital ***bills*** for that claim makes perfect sense, since hospitals' billed charges are widely recognized to be "sticker prices" that virtually no one pays.  *See id.* at 844-45 (because "the bill by the provider may not be reflective of the charge that is usual and customary for the service at issue," the trier of fact must consider "the amount of payment that the provider is ***receiving***" for those services); *id.* at 844 ("Patients paying for their own emergency medical services are typically billed the charge master price although hospitals often accept a lower payment in full satisfaction of the debt."); *Colomar v. Mercy Hosp., Inc.*, 461 F. Supp. 2d 1265, 1271-72 (S.D. Fla. 2006) ("the reality is that the rates hospitals charge for services do not always accurately reflect the value of the services, especially when the hospital routinely accepts much less for them.").[2]

---

[2] *See also U.S. v. Berkeley Heartlab, Inc.*, 2017 WL 2972143, at *5 (D.S.C. July 12, 2017) (noting that "many courts actually have considered whether an unpaid hospital bill is admissible as evidence of the market value of physician services, often in the damages context," and that "these courts have uniformly acknowledged that physicians' billed charges do not necessarily reflect the market value of physician services") (collecting cases); *Bowden v. Med. Ctr., Inc.*, 309 Ga. 188, 189 n.2 (2020) (quoting with approval the lower court's description of a hospital's chargemaster as being "like the sticker price of a new car"); *In re N. Cypress Med. Ctr. Operating Co., Ltd.*, 559 S.W.3d 128, 132-33 (Tex. 2018) ("few patients today ever pay a hospital's full charges" but that "hospitals are pressured to set these charges as high as possible because reimbursement rates

The common-sense notion that a hospital's billed charges bear little connection to what that hospital actually receives in payment is not seriously in dispute. Even the Hospitals' parent company, Tenet Healthcare Corporation, acknowledges as much in its SEC filings, which state: "[g]ross charges [*i.e.*, billed charges] are retail charges. They are not the same as actual pricing, and they generally ***do not reflect what a hospital is ultimately paid***." (SMF ¶ 22.) Mr. Hailey, Tenet's head of Managed Care and the person ultimately responsible for negotiating contracts with Cigna, ██████████████████████████████████████████████████████ ██████████████████████████ (SMF ¶ 23.)

The Hospitals' own chargemasters—a master list of all their billed charges—vividly illustrate why billed charges are a total fiction. For instance, three plaintiffs-Hospitals had the following variation in their billed charges for the exact same service (CPT code 96375, intravenous injection): ██████████████████████████████████████████████████ ██████████████████████████████). (SMF ¶ 24.) In other words, three plaintiff-Hospitals in the same local market had a variation of ████████████████████ in their billed charges for the exact same service. And, according to the Hospitals, the FMV for that same service is either ████████████████, or ████████████████, or somewhere in between—depending on which hospital a person who has to be treated for an emergency happens to end up in.

Take another service: CPT code J7030, which is "1,000 cc infusion of saline solution." (SMF ¶ 25.) For this service, plaintiff-Hospital Coral Gables charges ████████████, while plaintiff-Hospital Palm Beach Gardens charges ████████████. (*Id.*) Thus, the variance in billed charges

---

typically increase along with them," and that "because of the way chargemaster pricing has evolved, the charges themselves are not dispositive of what is reasonable").

for this very basic service—infusing saline solution—between two plaintiff-Hospitals in the same local market is ███. And under the Hospitals' view of the world, the FMV for this same service is either ████████ or ████████—again, depending on the luck of the draw for the person who has to go out-of-network to one of these hospitals in an emergency.

The Hospitals' billed charges for codes used for ER visits likewise vary significantly. For instance, the Hospitals' billed charges for code 99283 (which reflects a Level III ER visit) varies from ███ at St. Mary's to ███ at Good Samaritan. (*Id.* ¶ 26.) And the Hospitals' year-to-year increases in their billed charges for ER visit codes are also all over the map, which further shows the disconnect between the Hospitals' billed charges and the actual value of these services. (*Id.* ¶ 27 (showing that between 2019 and 2020, several of the Hospitals increased their billed charges for Level I-V ER visits by ███ one Hospital increased them by ███, and one Hospital raised them by between ████████).)

Tellingly, the Hospitals' Rule 30(b)(6) witness on chargemaster pricing, Joshua Foote, could not defend these wild variations. He said that ███████████████████ ███████████████████████████████ ████████████████ (*Id.* ¶ 28.) And when asked if there was ███████████████████████████ ████████████ Mr. Foote ███████████████████ ████████████████ (*Id.* ¶ 29.)

The reason that the Hospitals have no real defense or explanation for these variations is that there is none. Billed charges are not real prices; they are make-believe prices that hospitals unilaterally manipulate to maximize their revenue, and they bear no connection to either the actual cost of the healthcare services that the hospital provides, or to what the hospital should reasonably

expect to receive for those services.  (*See supra* at 12-14 & n.2.) The notion that 75% of a hospital's billed charges—*i.e.*, 75% of a sticker price that the hospital can manipulate at will—can ever be considered FMV under the Florida statute makes no sense, given that the whole point under *Baker County* is to figure out how much the hospital actually gets *paid* for its claims, not what it charges.

In short, the fundamental problem with the Hospitals' argument that FMV for every single claim for all eight Hospitals is supposedly 75% of their billed charges is that this one-size-fits-all valuation is contrary to the Florida statute, and it ignores *Baker County*'s instruction that all non-Medicare and Medicaid sources of a hospital's claim payment should be considered.   The Hospitals' evidence of FMV does not show what "price . . . a willing buyer will pay and a willing seller will accept in an arm's-length transaction," 31 So. 3d at 845, and it thus does not create a genuine dispute of material of fact necessary to survive summary judgment.

      **C.**      **The Eight Plaintiffs-Hospitals Are Not the Relevant "Community," as the Florida Requires.**

Finally, Plaintiffs' definition of FMV is wrong as matter of law for another reason:  just as Mr. Watson improperly ignores relevant sources of the Hospitals' payments, he also ignores that FMV is supposed to be defined by reference to "the usual and customary provider charges for similar services *in the community* where the services were provided."  Fla. Stat. § 641.513(5)(b).

*Baker County* was clear on this point, affirming the trial court's holding that "[t]he determination of what constitutes 'the community where the services were provided' is a question of fact that is *not limited by the type of provider*."  31 So.3d at 845.  And Mr. Watson agreed at his deposition that ████████████████████████████████████████████ (SMF ¶ 30.)  But rather than focus on the entire market in the community, Mr. Watson calculated an FMV specific to just the eight Hospitals as a group.  (*Id.* ¶ 18 ("Plaintiffs' expert made the determination that 75% of *Plaintiffs'* billed charges equals [FMV]").)

Thus, Mr. Watson's opinion is that ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████   (*Id.* ¶ 31.)  But as he also admitted, the Hospitals' billed charges are very different from

other providers, since the Hospitals set their charges to be ████████████████  of the charges

of all hospitals in the community, and one Hospital's billed charges are ████████████. (*Id.*

¶ 32 ("all of the hospitals in question are between ██████████████████  with the

exception of one, which ████████████████████").)

If the Florida legislature had meant to say that FMV for a particular service should be equal

to the usual and customary charge for that service by the particular provider-plaintiff alone, it

would have done so.  It did not, instead using "the usual and customary provider charges for similar

services in the community where the services were provided" as a benchmark.  Mr. Watson's

limitation of FMV to just the eight Hospitals is on its face inconsistent with the statute, and thus

his FMV opinions cannot sustain the Hospitals' burden for that reason as well.

**II.    For the 36 Remaining Disputed Inpatient Claims, the Hospitals Do Not Have Admissible Evidence to Show When the Patients' EMC Ended.**

83 of the 525 claims the Hospitals originally asserted involve inpatient admissions.  (SMF

¶ 33.)  Cigna served an expert report from medical experts who identified the dates on which each

of these patients became stable, such that their EMC came to an end.  (*Id.* ¶ 36.)  After the Hospitals

dismissed some of those claims as part of their TAC, there remained 36 claims where Cigna's

medical experts opined that the patient was stabilized before the date they were discharged or

transferred to a different facility, meaning that those claims involved non-emergency care to some

extent.  (*Id.* ¶ 38.)  The Hospitals then served an expert report from Dr. Ramirez, purportedly in

rebuttal.

Cigna is concurrently moving to exclude the opinions of Dr. Ramirez.  As detailed in that motion, Dr. Ramirez's opinions should be excluded as improper rebuttal opinions; and alternatively, as untimely under Rule 26(a)(2)(B).  The Hospitals previously said that they would rely on expert evidence to establish the dates on which each patient's EMC ended, and in fact they refused to provide a corporate representative "to testify on the specific clinical determinations made for claims at issue in this matter, as Plaintiffs believe such opinions should be properly rendered by an expert witness."  (*Id.* ¶ 40; *see also id.* ¶ 41 (the Hospitals' corporate representative testifying ███████████████████████████████████████████████████████████ ██████████████).)  Without the opinions of Dr. Ramirez, the Hospitals do not have evidence to show that these patients had EMCs to trigger Cigna's payment obligations.  Thus, if the Court excludes those opinions, it should grant summary judgment on 36 inpatient claims in accordance with the expert report of Cigna's medical experts.

## III.   The Court Should Dismiss Without Prejudice All Individual Claim Lines from the Disputed Claims that Cigna Fully Denied for Reasons Unrelated to this Dispute.

Cigna seeks dismissal of a subset of the disputed claims: specifically, individual claim lines for services that Cigna fully denied for reasons unrelated to this dispute—including because those services did not comply with Cigna's policies and claims bundling procedures, were considered experimental and thus not covered by the member's benefit plan, and the like.  Those fully-denied claim lines are summarized in Exhibit 15 to the SMF, and they add up to a total of $303,662.  (SMF ¶ 42.)  The fully-denied claim lines raise the same "right-to-payment" rather than "rate-of-payment" issue that the Court previously identified when it dismissed "claims for which Cigna fully denied coverage."  (SMF ¶ 2.)  The Hospitals should not be able to recover damages on these fully-denied claim lines, and these claim lines should be dismissed without prejudice accordingly.

As Natalie Fuqua (Cigna's Rule 30(b)(6) witness on how Cigna adjudicates claims for out-of-network emergency services under Exchange Act plans in this market) explained, "for the out-of-network IFP claims, when the claim comes into the system, it goes through its normal processing."  (*Id.* ¶ 43.)  As part of that, Cigna "follow[s] compliance guidelines" and "coding initiatives" in reviewing the claim; it also uses a "software system to review the codes for claims" to "determine[] whether and how it pays particular line items within the claim."  (*Id.* ¶¶ 44-45.)

Thus, for example, individual claim lines for "services considered incidental or mutually exclusive to the primary service rendered or as part of a global allowance are not eligible for separate reimbursement" (*id.* ¶ 46 (Fuqua)), and a claim line for such an incidental service would be denied and not paid separately.  (*Id.* ¶ 47 (such a service would "be mutually inclusive to the primary service that was billed and would not be allowed to be unbundled from that service for additional payment") (Fuqua).)  After processing the claim and denying individual claim lines that are not reimbursable, Cigna typically sends an explanation of benefits form (EOB) and an explanation of payment form (EOP) for the claim, which tell both the member (EOB) and the provider (EOP), among other things, "what's allowed, not covered, paid amount and member liability."  (*See id.* ¶ 48 (Fuqua).)

Although Cigna's claims processing and claim edits may not result in the entire claim being denied, these line-item denials still raise a "right to payment" issue rather than a "rate of payment" issue—because in these situations, Cigna will deny the ***entire claim line*** (*i.e.*, making zero payment for a particular line-item service) rather than paying that claim line in part.  For example:

- EOP for patient ▮▮ ., at 4-5:  denying claim line ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SMF ¶ 49);

- EOP for patient ███, at 3-4:  denying claim line ████████████████████
  ███████████████████████████████████████████ (SMF ¶ 50);

- EOP for patient ███., at 3, 6:  denying claim line ███████████████████
  ████████████████ (SMF ¶ 51.)

As the Court previously recognized, "there is indeed a difference between a 'rate of payment' and a 'right to payment' claim.  Nonpayment, or zero payment, infers that the claim has been outright denied.  Yet, nothing in the SAC even remotely suggests that Plaintiffs' claims include claims for which reimbursement has been denied."  (SMF ¶ 2; *see also id.* (citing allegations from the SAC that "refer[] to underpayment, not nonpayment").)

The Court thus previously dismissed without prejudice the "claims for which Cigna fully denied coverage."  (*Id.*)  The same outcome should follow with respect to claim ***lines*** that Cigna denied in full.  Just like the Hospitals do not allege that Florida Statute § 627.64194 somehow overrides Cigna's ability to fully deny claims in normal course (for instance, fully denying a claim where the member was not actually eligible to receive services under a Cigna benefit plan), the Hospitals likewise do not allege—nor can they—that this Florida statute somehow precludes Cigna from denying individual claim lines in the normal course of processing and adjudicating claims.  And to the extent the Hospitals may disagree with any individual line-item denials (for instance, whether Cigna correctly applied its policies to deny a particular service line on a particular claim), that is a disagreement for a different time, and it is not part of this case.

Thus, Cigna respectfully requests that the Court grant summary judgment dismissing the claim lines summarized in Exhibit 15 to the SMF.  (SMF ¶ 42.)

**IV.    The Court Should Enter Summary Judgment on Five Claims Under Non-Florida Insurance Policies.**

Finally, five disputed claims involve patients covered by insurance policies issued outside of the State of Florida.  (SMF ¶ 52.)  The Court should enter summary judgment on those claims. The Hospitals' only claims is under Florida Statute § 627.64194(4), which applies to the reimbursement of "covered emergency services provided to an insured." *See* Fla. Stat. §§ 627.64194(4) & (2).  Florida Statute § 627.64194(1)(c) defines "[i]nsured" as "a person who is covered under an individual or group health insurance policy delivered or issued for delivery ***in this state***[.]"  (emphasis added).  Thus, summary judgment on those claims is proper. *See Worldwide Aircraft Servs., Inc. v. United Healthcare Ins. Co.*, 2018 WL 6589838, at \*6 (M.D. Fla. Dec. 14, 2018) (dismissing claim brought under Section 627.64194 because the insurance policy for the claim "was delivered in Louisiana," not Florida).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should enter summary judgment for Cigna.

20

Dated:  November 12, 2021

**MCDERMOTT WILL & EMERY LLP**

By:      */s/ Audrey Pumariega*

Audrey Pumariega (FBN 85206)
apumariega@mwe.com
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-4336
T: 305.329.4421 | F: 305.347.6500

Joshua Simon (admitted *pro hac vice*)
jsimon@mwe.com
Warren Haskel (admitted *pro hac vice*)
whaskel@mwe.com
Dmitriy Tishyevich (admitted *pro hac vice*)
dtishyevich@mwe.com
John J. Song (admitted *pro hac vice*)
jsong@mwe.com
Richard Diggs (admitted *pro hac vice*)
rdiggs@mwe.com
Chelsea Cosillos (admitted *pro hac vice*)
ccosillos@mwe.com
Halle Landsman (admitted *pro hac vice*)
hlandsman@mwe.com
One Vanderbilt Ave
New York, New York 10017
T: 212.547.5533 | F: 646.390.2958

*Counsel for Defendant Cigna Health and Life*
*Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on November 12, 2021, I electronically filed the foregoing document with the Clerk of Court via CM/ECF, which will send a Notice of Electronic Filing to the parties listed below:

Alan D. Lash
alash@lashgoldberg.com
Jonathan E. Siegelaub
jsiegelaub@lashgoldberg.com
Justin C. Fineberg
jfineberg@lashgoldberg.com
Greg J. Weintraub
gweintraub@lashgoldberg.com
Emily Pincow
epincow@lashgoldberg.com
Ashley P. Singrossi
asingrossi@lashgoldberg.com
William Baldwin
wbaldwin@lashgoldberg.com
LASH & GOLDBERG LLP
Miami Tower
100 S.E. 2nd Street
Suite 1200
Miami, FL 33131
Telephone: 305.347.4040
Facsimile: 305.347.4050

*Counsel for Plaintiffs*

*/s/ Audrey M. Pumariega*
Audrey M. Pumariega