**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| NORTH SHORE MEDICAL CENTER, INC., et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO: 1:20-CV-24914-KMM |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
CIGNA'S MOTION FOR SUMMARY JUDGMENT**

i

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 4

ARGUMENT ....................................................................................................................... 4

   I.   THERE IS A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER
      CIGNA UNDERPAID THE HOSPITALS' CLAIMS ...................................................... 5

   II.  THERE IS A GENUINE DISPUTE OF FACT AS TO WHETHER THE
      ADMITTED INPATIENTS RECEIVED NECESSARY EMERGENCY CARE .......... 12

   III. THE COURT SHOULD NOT DISMISS THE DENIED CLAIM LINES
      BECAUSE "BUNDLING" IS A RATE-OF-PAYMENT ISSUE ................................... 16

   IV. THERE IS A GENUINE DISPUTE OF MATERIAL FACT AS TO WHERE
      THE THREE POLICIES WERE DELIVERED OR ISSUED FOR DELIVERY ........... 19

CONCLUSION ................................................................................................................... 20

# **TABLE OF AUTHORITIES**

**Pages**

## **Cases**

*Aetna Health, Inc. v. Davila,*
   542 U.S. 200 (2004) ................................................................................................ 17

*Baker Cty. Med. Servs., Inc. v. Aetna Health Mgmt., LLC,*
   31 So. 3d 842 (Fla. 1st DCA 2010) ......................................................................... 5

*Borrero v. United Healthcare of N.Y., Inc.,*
   610 F.3d 1296 (11th Cir. 2010) .............................................................................. 17

*Christie Clinic, P.C. v. Multiplan, Inc.,*
   2008 WL 4615435 (C.D. Ill. Oct. 15, 2008) ............................................................ 8

*Citizens Ins. Co. of Am. v. Bowman,*
   525 So. 2d 991 (Fla. 3d DCA 1988) ...................................................................... 20

*Conn. State Dental Ass'n v. Anthem Health Plans, Inc.,*
   591 F.3d 1337 (11th Cir. 2009) .............................................................................. 17

*Crutcher v. Multiplan, Inc.,*
   2020 WL 4495710 (W.D. Mo. Aug. 4, 2020) .......................................................... 8

*Doyle v. Liberty Life Assurance Co. of Bos.,*
   542 F.3d 1352 (11th Cir. 2008) ............................................................................... 8

*Emergency Servs. of Zephyrhills, P.A. v. Coventry Health Care of Fla., Inc.,*
   281 F. Supp. 3d 1339 (S.D. Fla. 2017) .................................................................. 17

*Fla. Power & Light Co. v. Jennings,*
   518 So.2d 895 (Fla. 1987) ....................................................................................... 8

*Geddes v. United Staffing Alliance Employee Med. Plan,*
   469 F.3d 919 (10th Cir. 2006) ................................................................................. 8

*HCA Health Servs. of Ga. v. Emp'rs Health Ins. Co.,*
   240 F.3d 982 (11th Cir. 2001) ................................................................................. 8

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.,*
   527 F. Supp. 2d 1257 (D. Kan. 2007) ..................................................................... 8

*ISD Trenton, LLC v. Continental Benefits, LLC,*
   2020 WL 9454963 (M.D. Fla. Jan. 23, 2020) ........................................................ 18

*Lone Star OB/GYN Assocs. v. Aetna Health, Inc.*,
    579 F.3d 525 (5th Cir. 2009) ..................................................... 17

*Merkle v. Health Options, Inc.*,
    940 So. 2d 1190 (Fla. 4th DCA 2006) ................................. 5, 12

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    2016 WL 5817176 (C.D. Ill. Sept. 30, 2016) ............................ 8

*Schultz v. TM Florida-Ohio Realty Ltd.*,
    577 So. 2d 573 (Fla. 1991) .......................................................... 7

*United States v. 320.0 Acres of Land*,
    605 F.2d 762 (5th Cir. 1979) ....................................................... 8

*Walker v. Darby*,
    911 F.2d 1573 (11th Cir. 1990) ................................................... 4

## **Statutes**

Florida Statute § 641.513(5) ......................................................... 5, 9, 12

Florida Statute § 627.64194(4) ......................................................... 5, 12

Florida Statute § 627.64194(2) ....................................................... 12, 13

42 U.S.C. §§ 1395dd(a), (b) .............................................................. 15

Florida Statute § 641.47(8) ................................................................. 15

Florida Statute § 627.64194(1)(a) ..................................................... 15

Florida Statute § 627.64194(1)(c) ..................................................... 19

## **Rules**

Federal Rule of Civil Procedure 56(a) .................................................. 4

## PRELIMINARY STATEMENT

Plaintiffs ("Hospitals") submit this Response to Defendant Cigna Life & Health Insurance Company's ("Cigna") Motion for Summary Judgment ("Motion") (ECF No. 141).  The Hospitals are a series of affiliated hospitals in South Florida that have rendered emergency care to Cigna's insureds on an out-of-network basis.  Florida law unambiguously requires health insurers like Cigna to reimburse out-of-network emergency claims at rates equaling the usual and customary provider charges for similar services in the community, *i.e.*, the fair market value of the services. Cigna has not done so.  Instead, it has violated the law by paying rates substantially below the fair market value of the services.  Worse, as demonstrated in the Hospitals' cross-motion for partial summary judgment on Cigna's affirmative defenses (ECF No. 133), Cigna has done so deliberately, by employing a reimbursement methodology that is facially at odds with the requirements of Florida law.

Florida law is clear that fair market value is the price to which willing parties would agree in an arm's length transaction.  Here, the record that has been developed and will be presented at trial demonstrates that Cigna, despite its feigned ignorance, knows exactly what fair market value is: seventy-five percent (75%) of the charges billed for the services.  That reality is evidenced by (among other record evidence) the fact that Cigna previously reimbursed the Hospitals at 75% of billed charges pursuant to an out-of-network contract that was in effect for years, and thereafter continued to pay 75% of charges through a series of single-case agreements and its agreements with rental networks.  In other words, when these parties actually have settled upon reimbursement rates through arm's length negotiations, they have agreed that those rates should be 75% of charges.  And there is substantial other record evidence supporting that such arrangements are in accord with Florida law and industry custom and norm.

The Hospitals expressed a desire to contract with Cigna on an in-network basis on agreed-upon terms, but Cigna refused.  Cigna did so knowing full well that (1) the Hospitals' out-of-network status would have a deleterious impact on its members (who would be foreclosed from receiving non-emergent care at the Hospitals) and (2) pursuant to Florida law and longstanding industry custom, it would be required to pay higher out-of-network rates when those members access emergency care.  Yet Cigna made a calculated business decision to keep the Hospitals out of network, has paid egregiously low rates that it has unilaterally determined, and has systematically flouted Florida laws intended to shield out-of-network emergency providers from just this sort of predatory behavior.

Here, Cigna offers a series of tendentious arguments intended to excuse its wrongdoing.  Those arguments misrepresent the record, misstate the law, and should be rejected in their entirety.  As shown below in Point I, Cigna's primary argument for summary judgment rests upon an extended non sequitur.  Cigna contends that because, in its view, the Hospitals' expert analysis is fatally flawed, the Hospitals cannot provide evidentiary support for their position that 75% of billed charges is the fair market value of the medical services rendered.  For that reason, according to Cigna, the Court should grant summary judgment in its favor.  To be sure, the Hospitals' expert analysis is perfectly valid, and the Hospitals intend to present that analysis at trial.  But, even if Cigna were correct that a fair market value computation must, as a matter of law, include certain rate data that the Hospitals' expert found not to be comparable, Cigna's conclusion that summary judgment is warranted still would not follow.  That is because the Hospitals' burden is not to prove that fair market value is 75% of charges (although they fully expect to do so at trial), but merely to prove that it is something more than Cigna paid.  And there are reams of data produced in this case that would allow a jury to conclude that fair market value is more than Cigna paid (including

data that supports 75% of charges as the fair market value). ███████████████████████

██████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. In sum, Cigna's

motion does not contest liability and instead rests on the flawed premise that there is no evidentiary

support for the jury to award the Hospitals damages caused by Cigna's statutory violation in failing

to pay fair market value. It is fundamentally misguided and should be denied.

As shown below in Point II, Cigna's plea for summary judgment on the inpatient claims

should be denied. Cigna contends that the Hospitals' clinical expert should be precluded from

testifying, and that without his testimony the Hospitals cannot prove that the admitted patients

required emergency care for the full lengths of their hospital stays. But that argument fails because

the Hospitals' clinical expert should not be precluded from testifying and, in any event, there is

substantial evidence apart from his testimony and opinions demonstrating that the patients required

and received emergency care. Most notably, the relevant health plans provide out-of-network

coverage only for emergency medical services, and yet Cigna adjudicated the full claims as

payable and actually paid them (albeit at unlawfully low rates). A jury could reasonably infer that

Cigna's paying these claims was an admission that the claims were for medically necessary

emergency services and were payable. And as discussed below and in the Hospitals'

simultaneously filed response in opposition to Cigna's motion to exclude the Hospitals' clinical

expert, Cigna's position rests on a standard that is inconsistent with governing Florida law.

As shown below in Point III, Cigna's argument that the Court should grant summary

judgment on certain denied line items is without merit. Cigna contends that because it paid nothing

on those items, the items necessarily raise a "right-to-payment" issue. But that argument fails

because paying nothing on a given line item does not inherently render a dispute over that line

item a right-to-payment dispute.  The question is *why* Cigna paid nothing on the items, *i.e.*, whether Cigna determined that the underlying medical services corresponding to those line items were not covered (a right-to-payment dispute), or whether Cigna considered them covered but deemed the payments for those items to be fully encompassed within other line items it did pay (a rate-of-payment dispute).  Here, the evidence shows that the latter explanation applies.

Finally, as shown below in Point IV, Cigna contends that the Court should grant summary judgment on five specific claims because the patients' insurance policies are not governed by the Florida emergency care statutes.  But that argument fails because Cigna has not presented record evidence demonstrating beyond genuine dispute that the subject policies were neither delivered nor issued for delivery in Florida.

## **BACKGROUND**

A fulsome statement of the relevant facts is presented in the Hospitals' Response to Cigna's Statement of Material Facts and Statement of Additional Material Facts ("SOF Response"), submitted in conjunction with this Motion, as well as the Hospitals' Statement of Material Facts submitted in conjunction with their Motion for Partial Summary Judgment (ECF No. 136), which is expressly adopted and incorporated herein.

## **ARGUMENT**

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact.  *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990).  Once the moving party has satisfied that burden by presenting evidence that, if uncontradicted, would entitle it to a directed verdict at trial, the burden shifts to the non-

moving party to present specific facts demonstrating a genuine dispute. *Id.* The non-moving party must present "enough of a showing that the jury could reasonably find for that party." *Id.* at 1577.

## I.    THERE IS A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER CIGNA UNDERPAID THE HOSPITALS' CLAIMS

Florida Statute § 627.64194(4) requires health insurers like Cigna to reimburse out-of-network providers of emergency medical services according to the standard set forth in Florida Statute § 641.513(5). That provision, in turn, mandates reimbursement at an amount that is the lesser of three alternative measurements.[1] Relevant here, it requires payment equaling "[t]he usual and customary provider charges for similar services in the community where the services were provided . . . ." Fla. Stat. § 641.513(5). And Florida law provides that the usual and customary provider charges ("U&C") are "the fair market value of the services provided[,]" which is "the price that a willing buyer will pay and a willing seller will accept in an arm's length transaction." *Baker Cty. Med. Servs., Inc. v. Aetna Health Mgmt., LLC,* 31 So. 3d 842, 845 (Fla. 1st DCA 2010). Accordingly, the key disputed question in this case is factual: what is the fair market value of the emergency medical services the Hospitals rendered to Cigna's members? If fair market value is more than the reimbursement amounts that Cigna allowed, then Cigna is liable for the difference.

To assist in proving that the amounts Cigna allowed are less than fair market value, the Hospitals have proffered the expert report of Jim Watson. (SOF Response ¶ 53.) Mr. Watson

---

[1] Cigna repeatedly mischaracterizes the statutes as "patient-protective," contending without any support that their "obvious intent is to make sure that a patient with an emergency condition is not penalized if the ambulance happens to take him or her to an out-of-network hospital[.]" (Motion at 1, 3.) In fact, as the Florida courts have recognized, the statutes are *provider*-protective; their intent is to shield emergency providers from predatory behavior by health insurers. *See Merkle v. Health Options, Inc.,* 940 So. 2d 1190, 1196 (Fla. 4th DCA 2006) ("The intent of [§ 641.513(5)] is to ensure that the non-participating providers are adequately paid for a service they are required by law to perform.") In that sense, it is significant that §§ 627.64194 and 641.513 fall within Title XXXVII of the Florida Statutes, which regulates insurers. They do not fall within Title XXIX, which regulates public health (including regulation of hospitals and other medical providers).

reviewed large volumes of historical rate data, including, *inter alia*, the Hospitals' and Cigna's full commercial paid claims data.  (SOF Response ¶¶ 54-58, 61-62.)  Based upon his review, Mr. Watson concluded that the rate data most comparable to the out-of-network rates at issue was that resulting from: (1) claims reimbursed under leased networks; (2) claims reimbursed pursuant to out-of-network single case agreements; and (3) claims reimbursed pursuant to a prior out-of-network contract between Cigna and the Hospitals.  (SOF Response ¶ 62.)  Based on his review of the data, Mr. Watson determined that fair market value of the services rendered equals 75% of the charges billed for those services.  (SOF Response ¶¶ 31, 62.)

Cigna disputes Mr. Watson's findings.  It contends that his analysis is inconsistent with the standard set forth in *Baker County*, because that case requires that a fair market value analysis encompass *all* rates paid for similar medical services in the relevant community (with the exception of Medicare and Medicaid rates).  (Motion at 7-11.)  In other words, Cigna's position is that a fair market value calculation cannot account for the relative comparability of the potential benchmark claims.  (Motion at 11.)  Because Mr. Watson decided that in-network rates are insufficiently comparable and considered but ultimately excluded them from his benchmark claim set, Cigna has separately moved to preclude his testimony.  (ECF No. 140.)  Here, Cigna contends that summary judgment is appropriate because, without Mr. Watson's testimony, the Hospitals have no evidence demonstrating their entitlement to reimbursement at 75% of billed charges.

As an initial matter, for reasons comprehensively explained in the Hospitals' response to Cigna's *Daubert* motion,[2] Cigna's arguments regarding the validity of Mr. Watson's opinion are simply wrong.  In short, *Baker County* provides only that "[i]n determining the fair market value

---

[2] The arguments and authorities presented in the Hospitals' response to Cigna's *Daubert* motion are expressly adopted and incorporated by reference herein.

of the services, it is appropriate **to consider** the amounts billed and the amounts accepted by providers with [the exception of Medicare and Medicaid rates]." 31 So. 3d at 845 (emphasis added). *Baker County* does not dictate *how* those amounts ought to be considered, it does not direct that various rates in the market be weighted in any particular way, and it certainly does not, as Cigna suggests, preclude comparability considerations. Rather, it broadly sets forth the universe of information that ought to be considered in calculating fair market value and affords discretion to the parties (and experts and, ultimately, to the jury) to determine how that information should be assessed.[3]

As discussed in greater detail in the Hospitals' response to Cigna's *Daubert* motion, Mr. Watson expressly applied the willing-buyer / willing-seller standard. (SOF Response ¶ 61.)  In doing so, he gave appropriate weight to the transactions that he found most comparable to the out-of-network emergency claims at issue: those in which insurer and hospital agree at arm's length on a price, without other benefits exchanged as part of a broader transaction. Mr. Watson amply supported his conclusions that hospitals discount prices as part of a bargain for obtaining the advantages of being in-network (most notably, the ability to provide non-emergent services), and, conversely, that hospitals expect to receive, and insurers are willing to pay and in fact do pay, higher rates for out-of-network services. (SOF Response ¶ 61.)

Mr. Watson's analysis likewise comports with industry custom in determining the "usual and customary" charge. As the Eleventh Circuit has aptly recognized, "[g]iven what is usual and customary in the managed care industry, we cannot imagine that even a poorly represented entity

---

[3] The Florida Supreme Court has held that "[w]hen determining the fair market value," the assessor "*must consider but not necessarily use* each of the factors," and that "[t]he ultimate method of valuation employed and the weight, *if any*, to be given each factor considered is within the discretion of the assessor." *See Schultz v. TM Florida-Ohio Realty Ltd.*, 577 So. 2d 573, 575 (Fla. 1991) (emphasis added).

would promise to discount its fees in return for nothing." *HCA Health Servs. of Ga. v. Emp'rs Health Ins. Co.*, 240 F.3d 982, 999 n.33 (11th Cir. 2001), *implied overruling on other grounds recognized by Doyle v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1352, 1359 (11th Cir. 2008); *see also Geddes v. United Staffing Alliance Employee Med. Plan*, 469 F.3d 919, 930 (10th Cir. 2006) ("[T]he in-network provider fee is by definition not the usual fee charged by physicians in any given market. The whole purpose of assembling a network of preferred health providers is to allow the insurer to cover its beneficiaries' expenses on a negotiated schedule ***below the prevailing market rate***." (emphasis added).)[4]

Moreover, "courts have consistently recognized that, in general, *comparable* sales constitute the best evidence of market value." *United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 & n.61 (5th Cir. 1979) (emphasis added). It was not improper, much less proscribed by *Baker County*, for Mr. Watson to conclude that the most comparable transactions provide the most probative evidence of fair market value. *See, e.g.*, *Fla. Power & Light Co. v. Jennings*, 518 So.2d 895, 899 (Fla. 1987) ("[A]ny factor … which impacts on the market value of land … may be considered to explain the basis for an expert's valuation opinion.").[5]

---

[4] The Tenth Circuit in *Geddes* explicitly recognized that "industry custom" requires treating in-network and out-of-network rates differently. *See id.* at 930 ("[I]nterpreting a 'customary' charge in the medical market as synonymous with the discounted rate negotiated by a health plan with its preferred providers is a significant deviation from industry custom."). *See also generally Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 527 F. Supp. 2d 1257, 1265 (D. Kan. 2007) ("In healthcare, the premise of selective contracting is to deliver volume to a healthcare provider in exchange for better reimbursement rates from the MCO."); *Crutcher v. Multiplan, Inc.*, 2020 WL 4495710, at *1 (W.D. Mo. Aug. 4, 2020) (discussing managed care tradeoff between rate and volume); *Christie Clinic, P.C. v. Multiplan, Inc.*, 2008 WL 4615435, *1–2 (C.D. Ill. Oct. 15, 2008) (discussing relationship between steerage to in-network providers and rates); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 2016 WL 5817176, *2 (C.D. Ill. Sept. 30, 2016) (discussing relationship between price and volume in broad and narrow networks).

[5] Indeed, the *Baker County* court's exclusion of Medicare and Medicaid rates from the willing buyer / willing seller calculus, because they do not result from arm's length transactions, confirms

But, even assuming *arguendo* that Cigna were correct about Mr. Watson's analysis, its conclusion that summary judgment is warranted would still rest on several erroneous premises. First, Cigna assumes that because the Hospitals pled that fair market value is 75% of billed charges, their burden on liability requires them to prove at trial that fair market value is indeed 75% of billed charges. But that is plainly incorrect. The statutes require payment of U&C. Fla. Stat. §§ 627.64194; 641.513(5). U&C equals fair market value. *Baker County*, 31 So. 3d at 845. As such, Cigna is liable for damages for violating the statutes if fair market value is anything more than it paid. And given that the amounts Cigna paid equal ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SOF Response ¶ 64.), the question on summary judgment is whether a reasonable jury could find that fair market value is anything above that figure. And, as addressed below, given that *Cigna's own expert* performed multiple fair market value calculations that yielded values greater than what Cigna paid, that question undoubtedly must be answered in the affirmative. It is nonsensical for Cigna to suggest that it is not liable for violating Florida statutes if the jury finds fair market value to be less than 75% of charges but more than the amount Cigna paid. Cigna has conflated the issue of its liability with the amount of damages the jury may award.[6]

Second, Cigna assumes that to satisfy their burden of proof on liability, the Hospitals are required to proffer expert testimony (or, alternatively, that the only available evidence of fair market value is the expert testimony). But that is wrong. There is no legal principle—and Cigna

---

the inherent propriety of considering the *relationship* between the payer and provider in the fair market value analysis (and not just the similarity of the service as Cigna wrongly contends).

[6] The *Merkle* court rejected the argument Cigna makes here and articulated the necessary statutory inquiry: "Section 641.513(5) is aimed at protecting non-participating providers who must provide emergency medical services to HMO subscribers, ensuring they are compensated fairly. The question is not whether the HMOs are liable under section 641.513(5), but rather what is the appropriate method for determining the extent of that liability." 940 So. 2d at 1196.

cites none—requiring, as a matter of law, that a plaintiff present expert testimony to prove its case.[7]

Moreover, all of the underlying data that Mr. Watson used to calculate fair market value (as well

as the data that Cigna says he should have used) will be in the factual record for the jury to consider.

The voluminous record before the jury will include, *inter alia*, the Hospitals' chargemaster files

(*i.e.*, the "amounts billed" under *Baker County*)[8], the single case agreements, leased network

agreements, the prior contract between the Hospitals and Cigna, the Hospitals' contracted rates

with other payers, the amounts the Hospitals have received from other payers (both in-network

and out-of-network), and the amounts Cigna has allowed to other providers (both in-network and

out-of-network).  (SOF Response ¶¶ 54-58.)  This comprehensive universe of rate information will

show actual reimbursement amounts ranging literally from ███ percent of billed charges to ███

percent of billed charges. (SOF Response ¶ 56.)  As such, even without Mr. Watson's testimony,

the jury could review the underlying data and reasonably find that fair market value of the services

rendered is greater than the ███ of charges that Cigna paid.

---

[7] Cigna attempts to make hay of prior filings in this case—wherein the Hospitals represented that they needed expert analysis to calculate fair market value—to suggest that, without Mr. Watson's testimony, the Hospitals cannot satisfy their burden on liability.  (Motion at 3; SOF ¶ 1.)  That argument should be rejected out of hand.  While the Hospitals argued that, as a practical matter, they would rely on their expert to calculate fair market value, that is a far cry from contending that, as a matter of law, they are required to present expert testimony to satisfy their burden at trial. Moreover, while the Hospitals did argue that they should not be compelled to quantify fair market value in their pleading because their expert had not yet performed his analysis (SOF Response ¶ 20 [ECF No. 63 at 5-6]), Cigna *opposed* that argument (SOF Response ¶ 20 [ECF No. 66 at 2-3]). And the Court agreed with Cigna that the expert analysis was not necessary, as it ordered the Hospitals to specifically identify in their pleading the amount they claimed to be due on each claim, despite the expert analysis not having been completed.  (SOF Response ¶ 20 [ECF No. 53 at 8; ECF No. 68].)

[8] Cigna criticizes Mr. Watson's use of the Hospitals' billed charges.  (Motion at 11-15.)  But *Baker County* explicitly recognized that, in calculating fair market value, "it is appropriate to consider ***the amounts billed*** and the amounts accepted . . . ."  31 So. 3d at 845 (emphasis added).

Additionally, a reasonable jury may conclude that Cigna paid less than fair market value based on the testimony of Cigna's own valuation expert, Mary Beth Edwards.  While Ms. Edwards did not settle upon a single methodology for calculating fair market value, she offered three primary alternatives that are, in her view, defensible.  (SOF Response ¶¶ 65-70.)  ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████  (SOF Response ¶ 68.)  ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████  (SOF Response ¶ 69.)  ███████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.  (SOF Response ¶ 70.)  ████████████████████████████████████  which was Cigna's actual allowed amount and would entitle the Hospitals to an award of damages for Cigna's statutory violations.  (SOF Response ¶ 66.)[9]

Given the broad universe of rate information in the evidentiary record and the fact that Cigna's own expert opines that reasonable calculations of fair market value result in amounts greater than Cigna paid, it is indisputable that a reasonable jury could find that Cigna violated Florida statutes by paying less than fair market value and award the Hospitals damages

---

[9] The fact that Cigna paid the Hospitals even less than the rate in an unexecuted contract for them to participate in the subject plan, where the Hospitals would have received all the attendant benefits of in-network participation including steered elective patient volume, turns the fundamental managed care bargain on its head and speaks volumes regarding Cigna's statutory violations.

representing the difference between fair market value and the amount Cigna allowed. Accordingly, Cigna is not entitled to summary judgment on liability.[10]

## II.     THERE IS A GENUINE DISPUTE OF FACT AS TO WHETHER THE ADMITTED INPATIENTS RECEIVED NECESSARY EMERGENCY CARE

Cigna seeks summary judgment on thirty-six specific underlying claims, all of which result from patients who initially presented at the Hospitals' emergency departments and were then admitted for inpatient care.  (Motion at 16.)  Florida Statute § 627.64194(2) provides that "[a]n insurer is solely liable for payment of fees to a nonparticipating provider of covered emergency services provided to an insured . . . ."  Section 627.64194(4)—the provision under which the Hospitals bring suit—then requires the insurer to reimburse the nonparticipating provider of covered emergency services at U&C.  Fla. Stat. § 627.64194(4).  As such, the operative statutes apply only where the provider renders "emergency services."  In an attempt to disprove that the care rendered by the Hospitals qualifies as emergency services, Cigna has proffered an expert report from two clinicians, Drs. Michael Shapiro and Matthew O'Toole.  (SOF Response ¶ 71.)

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████. (SOF

---

[10] In fact, as addressed at length in the Hospitals' cross-motion for partial summary judgment on Cigna's affirmative defenses (ECF No. 133 at 5-9), there is no genuine dispute that the methodology Cigna employed to calculate its reimbursement rates contravenes Florida law.  While § 627.64194(4) obligates Cigna to pay U&C, ████████████████████████████████████ ███████████. (SOF Response ¶ 89.)  In so doing, it reimbursed outpatient emergency claims at rates equaling its median in-network rate and inpatient emergency claims at rates ██████████████████. (SOF Response ¶¶ 89, 90.) Yet Florida courts have recognized that such methodology is inconsistent with Florida law.  *See Merkle*, 940 So. 2d at 1196 ("Section 641.513(5) clearly imposes a duty on HMOs to reimburse non-participating providers according to the statute's dictates, not based on Medicare reimbursement rates.").

Response ¶¶ 71-73.)  Cigna contends that, by virtue of having been provided after stabilization, such care was not emergency care.  (SOF Response ¶ 74.)[11]

The Hospitals have proffered a rebuttal expert, Dr. Mario Ramirez.  (SOF Response ¶ 75.) Based upon his review of the medical records, Dr. Ramirez opines that the services rendered to these patients were emergency services and care.  (SOF Response ¶ 75.)  Cigna has separately moved to preclude Dr. Ramirez from testifying.  (ECF No. 140.)  Here, it seeks summary judgment on the thirty-six claims, contending that, absent Dr. Ramirez's testimony, the Hospitals have no evidence demonstrating that the patients were suffering emergency medical conditions warranting emergency care for the full lengths of their admissions.

Cigna's position is meritless for several reasons.  First, regardless of whether Dr. Ramirez is permitted to testify, the record includes substantial evidence that would allow a reasonable jury to find that the thirty-six patients were suffering emergency medical conditions (and thus received necessary emergency care) for the full lengths of their hospital stays.  Most notably, Cigna admits that the health plans at issue do not provide out-of-network benefits.  (Motion at 5; SOF ¶ 7.) Therefore, the plan members do not have coverage for services rendered by the Hospitals as out-of-network providers.  (*Id.*)  The only exception is for "emergency services," which Florida law requires Cigna to cover in all of its Florida health plans, irrespective of the network status of the emergency provider.  Fla. Stat. § 627.64194(2).  In other words, Cigna is obligated to reimburse the Hospitals for care rendered to its insureds only if such care constitutes emergency services. And for all of the thirty-six inpatient claims at issue here, Cigna in fact adjudicated the claims as payable and reimbursed the Hospitals (albeit at unlawfully low rates).  (SOF Response ¶ 78.)  This

---

[11] Significantly, ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
(SOF Response ¶ 77.)

suggests that Cigna itself concluded that those claims were in fact for emergency services, and a reasonable jury could conclude that these were emergency services subject to the Florida statutory framework from this evidence alone.

Moreover, Cigna cannot credibly maintain that its payment of the thirty-six claims was somehow inadvertent or did not reflect a determination that they were proper emergency claims.



. (SOF Response ¶¶ 80-81.)

. (SOF Response ¶¶ 80-81.)  Furthermore, the documentary record reflects that Cigna followed this process with respect to the claims at issue here.  (SOF Response ¶ 76.)  In other words,

. (SOF Response ¶ 76.)  Based on this record, a reasonable jury absolutely could conclude that the inpatient claims were fully reimbursable in accordance with Florida law.  In fact, the jury should presume as much.

Second, Cigna has proffered no competent evidence to rebut the presumptively emergent nature of the patients' medical conditions and the corresponding services rendered.  As addressed at length in the Hospitals' Motion for Partial Summary Judgment on Cigna's Affirmative Defenses (ECF No. 133 at 10-13) and in the Hospitals' Motion to Exclude Opinions of Defendant's Experts (ECF No. 132 at 3-12), both of which are expressly adopted and incorporated by reference herein, Cigna and its experts misstate the governing standard under Florida law.

(SOF Response ¶¶ 72-73.)



But fatal to Cigna's position is that Florida law imposes a substantially more expansive standard. Florida Statute § 627.64194(1)(a) provides that "'[e]mergency services' means emergency services and care, as defined in s. 641.47(8) . . . ." Section 641.47(8), in turn, defines "emergency services and care" to mean:

> [M]edical screening, examination, and evaluation by a physician or, to the extent permitted by applicable law, by other appropriate personnel under the supervision of a physician, to determine if an emergency medical condition exists and, if it does, ***the care, treatment, or surgery by a physician necessary to relieve or eliminate the emergency medical condition***, within the service capability of a hospital.

Fla. Stat. § 641.47(8) (emphasis added). In other words, the Florida statutes require a hospital treating a patient suffering from an emergency medical condition to provide the care necessary to relieve or eliminate the condition. EMTALA, in contrast, requires only that the hospital stabilize the patient. 42 U.S.C. §§ 1395dd(a), (b).



(SOF Response ¶ 83 [¶ 35].)   And Dr. O'Toole testified that "relieve or eliminate" means to *improve* the patient's condition, but that "stable," in contrast, means only a low risk of material deterioration.   (SOF Response ¶ 83.)   Given the above, the record includes ample evidence suggesting that the admitted inpatients received emergency care during their entire hospital stays under Florida law, and Cigna has adduced no competent evidence suggesting otherwise.

## III.   THE COURT SHOULD NOT DISMISS THE DENIED CLAIM LINES BECAUSE "BUNDLING" IS A RATE-OF-PAYMENT ISSUE

Certain of the disputed claims are so-called "hybrid claims," meaning Cigna reimbursed some line items within those claims but not others.  Cigna seeks dismissal without prejudice as to the individual line items that it did not reimburse.  (Motion at 17-20.)  It contends that "[t]he fully-denied claim lines raise the same 'right-to-payment' rather than 'rate-of-payment' issue that the Court previously identified when it dismissed 'claims for which Cigna fully denied coverage.'" (Motion at 17.)  Cigna explains its reasoning as follows: "line-item denials still raise a 'right to payment" issue rather than a 'rate of payment' issue—because in these situations, Cigna will deny the ***entire claim line*** . . . rather than paying the claim line in part."  (Motion at 18 (emphasis in original).)  In other words, Cigna contends that if a given claim line has been denied, that fact in and of itself renders a dispute over the line a right-to-payment dispute.

Cigna's argument fails because the critical question is not *whether* a given line item was denied, but *why* it was denied.  Here, the record demonstrates that Cigna did not deny coverage for the services contained within the line items (which would raise a right-to-payment issue).  Rather, it denied those line items because it deemed its coverage obligation to have been fully satisfied by its payment of other line items within the respective claims (creating a rate-of-payment issue).

In its prior order, the Court recognized a distinction between rate-of-payment and right-to-payment disputes.  (ECF No. 100 at 5-6.)  As the Court acknowledged, this distinction finds its

genesis in case law addressing complete preemption under ERISA. (ECF No. 100 at 5 (*citing Emergency Servs. of Zephyrhills, P.A. v. Coventry Health Care of Fla., Inc.*, 281 F. Supp. 3d 1339, 1345 (S.D. Fla. 2017).)[12]  In applying the preemption analysis, courts have recognized the rate-of-payment / right-to-payment distinction.  *See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1347-50 (11th Cir. 2009).  Such courts have held that where a plaintiff challenges a claim denial, the dispute is over the right to payment because the plaintiff is alleging, in substance, a breach of the plan coverage provisions.  Right-to-payment claims are therefore preempted.  *Id.*; *see also Lone Star OB/GYN Assocs. v. Aetna Health, Inc.*, 579 F.3d 525, 530-31 (5th Cir. 2009).  Conversely, where a payer has already paid a claim according to the plan terms, and the provider brings suit challenging the reimbursement amount pursuant to a different legal obligation, the asserted entitlement to additional payment does not rest upon a duty arising under the ERISA plan and is therefore independent.  *Id.*  For this reason, rate-of-payment disputes are not preempted.

While the distinction noted above is critical, it is not the end of the story.  The Eleventh Circuit has explained that each underlying claim must be evaluated "by its actual content." *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1304 (11th Cir. 2010).  When confronted with a claim denial, the court must inquire into the reason for the denial.  In *Borrero*, the Eleventh Circuit held that:

> These claims—about wrongfully denied benefits based on determinations of medical necessity—relate directly to the coverage afforded by the ERISA plan. Many of the other allegations in the complaint, for practices like downcoding and

---

[12] Doctrinally, complete preemption hinges on whether a plaintiff's legal claim is predicated upon a duty arising under the terms of an ERISA plan.  *See Aetna Health, Inc. v. Davila*, 542 U.S. 200, 210-11 (2004).  If so, the claim is deemed a coverage dispute and is preempted by ERISA's civil enforcement provision.  *Id.*  If the claim instead rests upon a duty independent of the ERISA plan, it is not an ERISA dispute and is not preempted.  *Id.*

bundling, are based on independent provider-insurer contracts and do not implicate ERISA.

*Id.* at 1304-05.   As such, the reason for the denial—not the mere fact of the denial—is determinative.   The ultimate question is whether the denial is based on a coverage determination under the plan terms.   If so, the dispute is over the right to payment.   If the denial is based on an insurer's policies or practices—such as bundling—that do not arise out of the plan terms, then the dispute is over the rate of payment.[13]

In *ISD Trenton, LLC v. Continental Benefits, LLC*, 2020 WL 9454963 (M.D. Fla. Jan. 23, 2020), the court applied *Borrero* to a dispute over certain denied line items within a hybrid claim for treatment of a patient's end-stage renal disease.   *Id.* at *7-8.   The insurer had denied payment of independent line items for medical supplies, lab work, and pharmaceuticals because it deemed them "Integral to care/procedure."   *Id.*   It was undisputed that the medical supplies, lab work, and pharmaceuticals were covered under the health plan; however, the insurer considered its payment obligation for those items fulfilled by its payment of other line items on the bill.   *Id.* at *8.   The contested question was whether the insurer's payment was sufficient to fully reimburse the provider for all of the services rendered, or whether the insurer owed additional money.   For this reason, the court held that the denied line items raised a rate-of-payment dispute and explained:

> [N]othing in the information provided indicates that NJEA Defendants denied any medical services based upon a lack of medical necessity, the experimental or investigational nature of the procedure, or any other coverage issue.   Instead, the documents highlight the billing dispute between the parties, which merely involves adjustments to the charges billed by ISD based upon the bundling of charges and the excessiveness of the charges, not upon coverage of the actual medical procedure. *Id.* at 7.

---

[13] "Bundling" is where an insurer denies payment on a line item that it deems to be more appropriately included—*i.e.,* "bundled"—within a larger line item that it covered and did pay. (SOF Response ¶ 84.)

The line-item denials here are indistinguishable from those at issue in *ISD*. 

(SOF Ex. 15 at 7-16 (emphasis added).)

(SOF Response ¶¶ 84-88.)  Accordingly, under the reasoning

set forth in *ISD*, the line-item denials here raise a rate-of-payment dispute only.[16]

## IV.   THERE IS A GENUINE DISPUTE OF MATERIAL FACT AS TO WHERE THE THREE POLICIES WERE DELIVERED OR ISSUED FOR DELIVERY

Finally, Cigna seeks summary judgment on five specific claims resulting from three

underlying health policies that it maintains are out-of-state policies.  (Motion at 20.)   Florida

---

[14] ████████████████████████████████████████████.  (SOF
Ex. 15 at 16.)  The Hospitals agree that this lone line item raises a right-to-payment dispute.

[15] The following hypothetical illustrates the point.  Suppose that a Cigna member receives IV fluid
costing $100 as part of emergency hospital treatment.  The hospital then submits a bill to Cigna
featuring a $100 line item for the IV fluid.  Cigna pays $800 to reimburse the visit, but it denies
the charge for the fluid.  The denial is accompanied by Remark Code E27, indicating that Cigna
considered the payment for the fluid to be encompassed within its $800 payment.  In that instance,
there would be no dispute as to whether IV fluid is covered under the health plan.  The only
question would be whether Cigna owes a total of $800 for all services rendered, including the IV
fluid, or whether it owes a total of $900.  That is a classic rate-of-payment dispute.

[16] To the extent Cigna argues that the Hospitals are somehow bound by Cigna's unilateral bundling
policies, that position would be without merit.  The Hospitals are non-contracted providers,
meaning they have not agreed to be bound by Cigna's internal reimbursement policies.

Statute § 627.64194(1)(c) defines "insured" to mean "a person who is covered under an individual or group health insurance policy delivered or issued for delivery in this state by an insurer authorized to transact business in this state."  As such, if the three policies were neither delivered nor issued for delivery in Florida, they would not be governed by the Florida statutes.

The Court should deny summary judgment because Cigna has not shown the absence of a genuine dispute of fact as to whether the policies in question were delivered and issued for delivery outside of Florida.  In fact, Cigna does not even technically argue that the policies were delivered and issued for delivery outside of Florida.  It contends only that they were "issued outside of the State of Florida[,]" which says nothing about where they were delivered.  (Motion at 20; SOF ¶ 52.)  It is certainly conceivable that an out-of-state insurance company could issue a policy that it delivers to a Florida resident.  *Cf. Citizens Ins. Co. of Am. v. Bowman*, 525 So. 2d 991 (Fla. 3d DCA 1988) (per curiam) (out-of-state insurance company subjected itself to personal jurisdiction in Florida by reissuing policy after policyholder had relocated to Florida).  Cigna's evidentiary submission does nothing to clarify the matter, as it consists exclusively ██████████████ ████████████████████████████████████████████████████ (SOF Ex. 20.)  Without more evidence, it is impossible to know beyond genuine dispute where the policies in question were delivered and issued for delivery.  As such, Cigna has failed to meet its burden as movant and the Court should deny summary judgment as to this issue.

## **CONCLUSION**

For all of the foregoing reasons, the Motion should be denied.

Dated:  December 1, 2021

                                  Respectfully Submitted,

                                  **LASH & GOLDBERG LLP**
Miami Tower, Suite 1200
100 Southeast Second Street
Miami, Florida 33131
Tel: 305-347-4040/Fax: 305-347-4050

By:      /s/ Greg J. Weintraub
            Alan D. Lash
            Florida Bar No. 510904
            alash@lashgoldberg.com
            Justin C. Fineberg
            Florida Bar No. 0053716
            jfineberg@lashgoldberg.com
            Greg J. Weintraub
            Florida Bar No. 75741
            gweintraub@lashgoldberg.com
            Emily L. Pincow
            Florida Bar No. 1010370
            epincow@lashgoldberg.com
            Jonathan E. Siegelaub
            Florida Bar No. 1019121
            jsiegelaub@lashgoldberg.com
            William E. Baldwin
            Florida Bar No. 118072
            wbaldwin@lashgoldberg.com
            Ashley P. Singrossi
            Florida Bar No. 1010132
            asingrossi@lashgoldberg.com

            *Attorneys for Plaintiffs*

21

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on **December 1, 2021** a copy of the foregoing was electronically filed with the Clerk of Court by using the Court's CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record:

*/s/ Greg J. Weintraub*
**Greg J. Weintraub**

22